JOHN H. RHODES vs. NORTHERN PACIFIC RAILROAD COMPANY.

July 24, 1885.

Railroad Company—Designation of Elevator for Receipt of Grain—
Laws 1874, c. 31.—Under chapter 31, Laws 1874, (Gen. St. 1878, c.
124, §§ 7, 8,) if a railroad company itself furnished at one of its stations
suitable warehouse facilities for receiving, handling, storing, and deliv-
ering, at the rates fixed by law, all grain designated for transportation
over its road, it might designate such warehouse or elevator as the exclu-
sive place at such station at which it would receive grain for shipment,
and might refuse to receive it or to furnish cars for its shipment at any
other place.

Same—Duty to Furnish Cars for Grain.—But if it failed or refused to fur-
nish such facilities, or on the terms designated, it was required, upon
reasonable notice, and when able to do so, to furnish cars in which to ship
grain out of any warehouse adjoining its track or side track at such sta-
tion.

Same—Creating Elevator Monopoly for Benefit of Third Person.—In
this case, the railroad company designated the elevator of one Sawyer as
the exclusive place at which it would receive grain for transportation,
and refused to furnish cars to any other warehouseman at this station.
Sawyer operated this elevator in his own name and as his own personal
business, and not as agent for the railroad company, so that every one
depositing grain in the elevator contracted with Sawyer individually, and
not with the railroad company. The railroad company, by refusing to
furnish cars at any other warehouse, gave Sawyer a monopoly of the
warehouse business at this station. Sawyer also imposed conditions of
storage not authorized by law. *Held*, that this did not constitute a pro-
viding of suitable facilities by the railroad company for the storing and
handling of grain, within the meaning of the statute, and that, there-
fore, it was required to furnish cars, upon reasonable notice, and when
able to do so, in which to ship grain out of other warehouses adjacent to
its tracks at such station.

Appeal by defendant from a judgment of the district court for Mor-
rison county, *Collins*, J., presiding, affirming a justice's judgment
from which defendant had appealed on questions of law and fact.

*W. P. Clough* and *John W. Willis*, for appellant.

*A. F. Storey,* for respondent.

MITCHELL, J. Gen. St. 1878, *c.* 6, provides, (section 75:) "It shall be the duty of any railroad corporation, when within their power to do so, and upon reasonable notice, to furnish suitable cars to any and all persons who may apply therefor, for the transportation of any and all usual kinds of freight." Section 76: "Any railroad corporation who shall violate any of the provisions of this act, as to extortion or unjust discrimination, shall forfeit for every such offence, to the person, company, or corporation aggrieved thereby, three times the actual damages sustained or overcharges paid by the said party aggrieved, together with cost of suit, to be recovered in a civil action therefor."

This action was brought to recover treble damages under this last section. The violation of the statute complained of is that defendant, though able to do so, refused, upon reasonable request, to furnish plaintiff cars in which to ship wheat out of his warehouse, situate in the village of Little Falls, adjacent to defendant's track, when, at the same time, it furnished cars to one Sawyer in which to ship wheat out of his warehouse or elevator similarly situated. As no point is made to the contrary, we shall assume without discussion that this, unless excused or justified, constitutes an act of discrimination within the meaning of the statute cited, entitling the party aggrieved to treble damages. The court, in substance, found (and the evidence sustains the finding) the refusal of defendant to furnish plaintiff cars in which to transport his grain, after request and reasonable notice, and that at the time of such refusal it was within its power to furnish them, and that at the same time it was furnishing cars to Sawyer to ship wheat out of his elevator. Indeed, upon the trial, the defendant did not seriously dispute these facts, but assumed to justify its refusal upon the ground that it had itself provided and maintained at the station of Little Falls an adequate elevator (this Sawyer's elevator) for the handling and storing of all grain designed for shipment, and which it had designated as the exclusive place for receiving grain for transportation; and that, having done this, it was not required to receive grain at any other place or warehouse.

Gen. St. 1878, *c.* 6, § 75, requires every railroad corporation to

provide and keep suitable facilities for receiving and handling all usual kinds of freight at any depot on the line of its road. Gen. St. 1878, *c.* 124, § 7, prohibits "any railroad company, or person * * * engaged in the business of keeping an elevator or warehouse, situated upon the line of any railroad, for receiving and handling grain for other persons, to charge any greater sum than two cents per bushel for receiving, elevating, handling, and delivering such grain." Section 8 of the same chapter provides that "whenever any railroad company shall refuse to receive, store, handle, and deliver grain at any station on its road, at the rates provided in section 1 (7) of this act, then in such case said railroad company shall, upon demand, allow any person * * * to erect and maintain at such station, adjoining the railroad track or side track, warehouses, to receive, store, and ship grain; or, at the option of the railroad company, such company shall build and maintain a side track to and for the use and accommodation of any warehouse near the station."

Inasmuch as small grain transported in bulk cannot be conveniently loaded directly from teams into the cars, but must ordinarily be first placed in warehouses or elevators and temporarily stored there, these duties and obligations in regard to handling and storing grain were undoubtedly imposed upon railroad companies as being necessarily incident to the convenient transportation of it by them as common carriers. Independently of any statute, common carriers have an undoubted right to adopt reasonable rules and regulations as to the place or places where they will receive freight for transportation. And in view of these statutory provisions already cited, we think it was clearly the legislative intent that if a railroad company itself should furnish suitable warehouse facilities for receiving, handling, and storing all grain designed for transportation over its road, that it might designate such warehouse or elevator as the exclusive place at which it would receive grain for shipment at that station, and that it might refuse to receive it or furnish cars for its shipment at any other place; but that when it failed or refused itself to furnish these facilities on the terms fixed by statute, then it should be required to allow others to build warehouses adjacent to its track, or else build side tracks to warehouses near the station, so that the

public might be furnished with the proper facilities. Of course this obligation in such cases necessarily implies and includes the further obligation of furnishing cars, upon reasonable notice, in which to ship grain out of such warehouses.

The court finds that at this station one Sawyer, by agreement with defendant, kept and maintained an adequate elevator for the reception and delivery of wheat. But he also finds that "no wheat was received into said elevator, except upon certain conditions embraced in, printed upon, and made part of, a 'wheat ticket,' so called, which ticket, (one of which in blank, Exhibit B, is in evidence,) after being filled out by the inspector as to date, number of bushels, and quality of wheat, was delivered by the inspector to the owner or depositor." These conditions, as shown by Exhibit B, are that the amount, kind, and grade of grain designated in the receipt will be delivered to the holder upon surrender thereof, subject to the following terms of storage: "(1) For receiving, elevating, insuring, delivering, and fifteen days' storage, $2\frac{1}{2}$ cents per bushel. (2) Storage charges, after first fifteen days, are one-half cent per bushel for each fifteen days, or part thereof, but shall not exceed five cents for six months. (3) This grain is held by me at owner's risk of loss or damage from the elements, riot, heating, the act of God, or which may in any way have been caused by the act of the holder of this receipt. (4) If, for any reason, it shall become necessary to remove this grain, I reserve the right to deliver it *from any other elevator or warehouses operated by me, subject to the same rate of freight to Duluth, St. Paul, or Minneapolis, as the present tariff rate from this station.* (5) This grain is subject to a charge of one-half cent per bushel for cleaning. (6) Any grain of the previous crop remaining in store on and after July 1st will be held at owner's risk as to condition."

We think the evidence sustains the finding that wheat was received at the Sawyer elevator only on these conditions, with the possible modification that if a depositor did not wish his grain insured, the charge named in the first condition would be reduced to two cents per bushel. But, conceding this, it is still apparent that this receipt contained conditions (notably the fourth and fifth) that no shipper of grain was bound to submit to, and which no common carrier has a

right to exact from one who delivers grain to him for transportation, and, as incident thereto, for temporary storage until shipped.

While the court finds, and the evidence shows, that Sawyer kept and maintained this elevator "by an agreement" (what does not appear) with defendant, yet the entire evidence in the case shows that it was managed and operated by him in his own name, as his own personal and individual business, and not in any sense as the agent of the railroad company. In short, that when a person deposited grain in this elevator, he was contracting entirely with Sawyer personally as a warehouseman, and not with the railroad company. Nobody was responsible for the wheat, so far as appears, but Sawyer individually. The effect of this was that every person who wished to ship wheat over defendant's road had first to deliver it to a particular warehouseman to store and handle. All that the railroad company did in the premises was to dictate what warehouseman should have a monopoly of the business at this station. This they effected by refusing any other warehouseman facilities for shipping. This was not a providing of suitable facilities by the railroad company within the meaning of the statute. Of course, it is not important who owns the buildings, or who is put in charge of the business, or who receives the profits of it; but, in order to constitute a compliance with the statute, the business must be so conducted that when a proposed shipper delivers his grain for transportation, and for temporary storage incident to such transportation, he can deliver it to the railroad company, and not be compelled to deliver it to some particular warehouseman, who might or might not be responsible, and to whom the shipper might not be at all willing to intrust his property.

For these reasons we are of opinion that the defendant had not provided suitable facilities for the receiving, storing, and handling of grain, or at the rates and on the terms fixed by law; and, not having done so, it was required upon reasonable notice, and when able to do so, to furnish plaintiff cars for the shipment of grain out of his warehouse situated adjacent to its track or side track, at this station.

Judgment affirmed.