UNITED STATES ex rel. NORTHWESTERN WAREHOUSE CO. v. OREGON R. & NAVIGATION CO.

(Circuit Court, D. Oregon. February 24, 1908.)

No. 3,137.

1. WAREHOUSEMEN—NATURE OF BUSINESS.
   Private warehousemen receiving grain on storage from producers to be held in storage until shipped to market are bailees for hire.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Warehousemen, § 12.]

2. SAME—WAREHOUSE RECEIPTS—NEGOTIABILITY.
   Where warehousemen receive grain for storage and issue warehouse receipts therefor, such receipts are negotiable, and, when transferred, carry the title to the grain on storage to the transferee.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Warehousemen, § 31.]

3. SAME—ISSUANCE OF RECEIPTS—DELIVERY OF GRAIN.
   The duty of a warehouseman receiving grain for storage is to issue receipts therefor as required by law, and to deliver the grain or a like quantity of similar grain represented by the receipts to the holder on demand on his complying with the conditions of the receipts.

4. SAME—NATURE OF WAREHOUSES.
   Warehouses erected for the receipt and storage of grain pending shipment to market, though conducted by warehousemen in their private capacity, are quasi public institutions.

5. CARRIERS—INTERSTATE COMMERCE ACT—DISCRIMINATION.
   Under the express provisions of interstate commerce act, Act Feb. 4, 1887, c. 104, § 3, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155], a common carrier is required not to make or give any undue or unreasonable preference or advantage to any particular firm, person, or corporation, or locality, or to any particular description of traffic, or subject any particular firm, corporation, or locality, or any particular description of traffic, nor to any undue or unreasonable prejudice or disadvantage in any respect whatsover, but this duty only applies where the circumstances or conditions are substantially similar.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 84.]

6. SAME—RULES.
   In the absence of statutory interposition and regulation, a carrier may establish and promulgate reasonable rules and regulations governing the manner and form in which it will receive such articles of commerce which it is bound to carry as well as the manner in which they shall be packed and prepared for shipment, and may alter or modify such rules from time to time on reasonable notice to the public.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 98.]

7. SAME—ERECTION OF ELEVATORS—STATIONS—DISCRIMINATION.
   A railroad company may establish a station for the special accommodation of a particular customer, and refuse to establish a like station elsewhere for the accommodation of others, and may also grant to one person the right to erect a warehouse or elevator on its right of way, and refuse to grant the same privilege to another, in the exercise of its right to private property.

8. SAME—DISTRIBUTION OF CARS—RULES.

Where a railroad having permitted the erection of grain elevators along its right of way for the storage of grain by producers and other owners, pending shipment, promulgated a rule requiring all orders for cars to be used in the shipment of grain from such warehouses to come through the warehousemen, the warehouseman in ordering cars for a storer of grain pursuant to such rule is the agent of the railroad company for that purpose, and not the agent of the storer, so that the railroad company is liable for the warehouseman's negligent or unfaithful performance of such duty.

9. SAME—DISCRIMINATION.

A railroad having permitted the erection of grain warehouses along its right of way in which grain was stored for producers and owners for hire as well as grain purchased and owned by the warehousemen promulgated a rule requiring all orders for cars for the shipment of grain from such warehouses to be made by the warehousemen. The rule operated to the prejudice of private storers of grain through the use of cars ordered by the warehousemen for the shipment of their own grain before cars could be obtained for the shipment of grain in the warehouse owned by storers, and by the appropriation of cars intended for storers by the warehousemen. *Held*, that the railroad company, under its duty to see that no discrimination was practiced, was bound either to change the rule, or to see that it was not permitted to operate in favor of one shipper and against another.

## In Equity.

This is a proceeding by writ of mandamus to require the defendant railroad company to furnish cars for the transportation of grain for the relator in proportion to the number of cars furnished for a like service for the use of relator's competitors engaged in the same business. The relator's business consists in buying grain for export, and to some extent in storing the same for hire. The defendant is engaged in operating a railroad, extending from Portland up the Columbia river, and through the state of Oregon eastward, with branches reaching into Eastern Washington, over which road and its said branches it transports large quantities of wheat and other grain. The defendant also operates lines of water transportation, by means of which it engages in an export business, with Portland as its principal port of departure, for produce and merchandise, the transportation of which originates in Oregon and Washington. In the course of its business the relator purchased, during the latter half of the year 1906 and the early part of the year 1907 large quantities of wheat stored in the warehouses of private firms and corporations, situated at the stations and sidings along the defendant's branch roads, principally within Whitman and Adams counties in the state of Washington, for transportation to Portland, Ore., and export therefrom to foreign markets. The names of the stations and sidings are given in relator's petition for relief, as are also the names of the owners or managers of the private warehouses, and the amount of wheat purchased in each, with aggregates running from 15,000 to 17,000 tons. The warehousemen conducting such warehouses wherein the relator purchased wheat were instructed that the same should be shipped over the lines of the defendant company, and the relator, at divers times has demanded of the defendant to furnish cars for the shipment of relator's wheat, so purchased, on storage in such warehouses, but relator has been unable to obtain any sufficient number of cars for the transportation of its wheat, or any portion thereof except a small percentage. Demands were made for cars, upon the general freight agent of the road, the car service agent, and the general manager thereof, and all with but little avail. Some of the persons, firms and corporations, owners, proprietors, or managers of many, if not all, of the warehouses located at the stations and sidings specified are also engaged in buying and exporting wheat and other grain, and in the course of such business purchase largely of grain on storage in their own warehouses, and ship the same by defendant's railroad lines from such warehouses. Further than this, it is shown by the petition, in

effect, that relator has been discriminated against as it pertains to the number of cars furnished for its use, considering the relative business transacted over the road by relator and other wheat buyers, being principally the warehousemen engaged in the same business, in comparison with the number furnished such other shippers. During the time covered by the petition, there was a shortage of cars, so that the railroad company was unable to carry all the freight offered. A motion to quash was interposed, and a hearing had upon the motion.

Teal & Minor, for relator.

W. W. Cotton, Arthur C. Spencer, and James G. Wilson, for defendant.

WOLVERTON, District Judge (after stating the facts as above). The principal question involved by this litigation hinges about a rule of the defendant railroad company which requires that orders and requisitions for cars with which to make shipments of grain from these private warehouses shall be made through the warehousemen. And it is urged on the part of the railroad company that, because it has adopted and promulgated such a rule, it is not obliged to honor orders or demands for cars made in any other way or through any other persons or officers.

The warehousemen are bailees for hire. They receive the grain on storage from the farmer or producer, for which warehouse receipts are issued. These receipts are negotiable, and when transferred carry the title to the grain on storage to the transferee. Grain buyers, in purchasing from the producer, obtain a delivery of the receipts to them, which entitles such buyers to the grain, or a like quantity, represented by the receipts. The warehouseman's obligations appertaining to his business are, when he receives grain on storage, to issue the receipts therefor as required by law, and to deliver the grain to the holder of the receipt or receipts upon his demand; the holder, of course, complying with the conditions of the receipt before being entitled to the delivery. If cars are furnished by the holder, the delivery is made by loading the grain upon the cars, and with this service terminates the warehouseman's duty with reference to the bailment. These warehouses, although conducted in private capacity, are nevertheless in a sense public concerns. By the custom of the country, producers having grain to dispose of take it to these depositories and store it pending sale or shipment, and all persons are permitted to store upon like terms and conditions. They are usually located in proximity to railroad or water transportation, so that when the time is ripe and convenient for shipping the stored commodity, it may speedily be sent upon its way into the markets elsewhere. So it is of the warehouses in which the petitioner has its grain stored. They are located upon the lines of the defendant company, so as to afford convenient and speedy transportation from such depositories when it is desired that shipments shall be made.

The railroad company owes a duty to the shipper that it will not unduly and unreasonably discriminate against him in favor of another or other shippers. This duty is imposed by law, and requires that the carrier shall not make or give any undue or unreasonable preference or advantage to any particular person, company, firm,

corporation, or locality, or any particular description of traffic in any respect whatever, or subject any particular company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatever. Such, in effect, are the provisions of section 3 of the interstate commerce act of Congress. Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]. This section has its near prototype in section 2 of the English Railway Traffic Act of 1854, and the courts of this country have adopted the English interpretation of that section. Interstate Commerce Commission v. Baltimore & Ohio R. Co. (C. C.) 43 Fed. 37; and the same case, 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 699. Prior to the adoption of this act, "railway traffic in this country," says Mr. Justice Brown in Interstate Commerce Commission v. B. & O. R. Co., 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 699, "was regulated by the principles of the common law applicable to common carriers, which demanded little more than that they should carry for all persons who applied, in the order in which the goods were delivered at the particular station, and that their charges for transportation should be reasonable." And later on in the opinion he continues:

"The principal objects of the interstate commerce act were to secure just and reasonable charges for transportation; to prohibit unjust discriminations in the rendition of like services under similar circumstances and conditions; to prevent undue or unreasonable preferences to persons, corporations or localities; to inhibit greater compensation for a shorter than for a longer distance over the same line; and to abolish combinations for the pooling of freights."

This is a concise, but comprehensive, summary of the purposes of the act. The specific conduct or acts of a transportation company which will amount to discrimination are largely relative, and depend more or less upon the environments and the conditions attending them, and are resolvable into questions of fact. Says Mr. Justice Shiras, speaking with reference to the third section of the act, in Texas & Pacific Railway v. Interstate Com. Com., 162 U. S. 197, 219, 16 Sup. Ct. 666, 678 (40 L. Ed. 940):

"It forbids any undue or unreasonable preference or advantage in favor of any person, company, firm, corporation or locality; and as there is nothing in the act which defines what shall be held to be due or undue, reasonable or unreasonable, such questions are questions not of law, but of fact."

The inhibition against making or giving any undue or unreasonable preference or advantage, or subjecting any person or firm to any prejudice or disadvantage, is suggestive that there may be preferences or advantages given or suffered that may be perfectly lawful and proper. Indeed, such is the case in business and commercial experience and practice. Thus it was held in Interstate Commerce Commission v. Baltimore & Ohio R. Co., supra, that it was not an undue or unreasonable preference for a railroad to sell 10-party tickets for a less rate per person traveling than tickets to single persons, and this upon the basis that the sales were not made, nor the preference or advantage given, under the same or similar circumstances or conditions. Numerous other illustrations from adjudications might be

given, but this one is sufficient to point the moral. If there be elements existing which afford proper grounds for distinguishing one shipper or locality from another, then, as between them, there can be no undue or unreasonable preference or advantage, because each must stand in his own class, and each will be entitled to be accorded a different standard of treatment, and the fact that a different standard is accorded each, under dissimilar conditions, can afford no grounds of complaint. One person, having live stock to ship, could not demand to be allowed the same rate per ton as another having grain, because of the manifest difference in the commodity to be handled. But if both shippers were moving the same commodity in shipment, the carrier must give to the one the same rate of freight as to the other, for the reason that the classification of the commodity shipped by each must necessarily be the same, and if the carrier should not give the same rate, manifestly there would be discrimination, which would inevitably result in a preference or advantage to the one getting the lesser rate, and could not be tolerated, because there is no reason for it. The one subjected to the higher rate could not compete with the other, being deprived of equal advantage. So it is that a difference in distance affords a ground for differentiation as to the rate to be charged; but where the distance is the same and the route is the same, a like rate must be given to all. The element of time of shipment or in transit, and other conditions and environments, may also affect the result. It is essential, therefore, in the consideration of whether there has been discrimination, or undue or unreasonable preference given or suffered, to find, as a basis for the inquiry, whether the attending conditions and circumstances affecting the respective shippers, and the service required and demanded, are substantially the same; that is to say, whether there is to "be contemporaneous service in the transportation of like kinds of traffic, under substantially the same circumstances and conditions." If it be so ascertained, then the investigation can proceed, for the standard of comparison and estimate is then present, and it may be further ascertained whether the competing shipper is being discriminated against. But if the contrary appears, there is an end of the investigation, for there can be no discrimination where there is no proper basis of comparison as to the services required.

In the absence of statutory interposition and regulation, the carrier is entitled to establish and promulgate reasonable rules and regulations governing the manner and form in which it will receive such articles of commerce as it is bound to carry, as well as the manner in which they shall be packed and prepared for shipment, so that they may be handled with convenience, safety, and dispatch; and it follows as a corollary to such authority that the carrier has also the power to alter or modify such rules from time to time, as it may deem proper and expedient, upon reasonable notice to the public, so that interested parties may be apprised of what is required when seeking service at the hands of such carrier. Harp v. Choctaw, O. & G. R. Co., 125 Fed. 145, 61 C. C. A. 405; Robinson et al. v. Baltimore & O. R. Co., 129 Fed. 753, 64 C. C. A. 281; Rhodes v. Northern Pacific R. Co., 34 Minn. 87, 24 N. W. 347. So the carrier may promulgate rules regulating the manner of conducting its own business, having due

regard under the law for the rights of persons and the public entitled to its services. Says Mr. Justice Jackson, sitting in the Circuit Court of Appeals in the case of Interstate Commerce Commission v. Baltimore & Ohio R. Co., supra:

"Subject to the two leading prohibitions that their charges shall not be unjust and unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or advantage, or subject to undue preference or disadvantage persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are recognized as sound, and adopted in other trades and pursuits."

And further on in his opinion, quoting from the report of Amalgamation Committee of 1872, p. 13, he continues:

"As regards the 'undue preference' branch of the English acts, 'the effect of the decisions seems to be that a company is bound to give the same treatment to all persons equally under the same circumstances; but that there is nothing to prevent a company, if acting with a view to its own profit, from imposing such condition as may incidentally have the effect of favoring one class of traders, or one town or one portion of their traffic, provided the conditions are the same to all persons, and are such as lead to the conclusion that they are really imposed for the benefit of the railway company.'"

While the Supreme Court has not adopted the language, yet it has affirmed the decision of the eminent jurist, and I take it that his reasoning and enunciation of the law is sound.

Other principles are advanced as having some bearing upon the controversy, namely, a railroad company may establish a station for the especial accommodation of a particular customer, and refuse to establish a like station elsewhere for the especial accommodation of another or other persons. A., T. & S. Railroad v. D. & N. O. Railroad, 110 U. S. 667, 682, 4 Sup. Ct. 185, 28 L. Ed. 291. A railroad may grant to one person a right to erect upon its right of way a warehouse for the storage of grain, and may not be compelled to grant the same privilege to another similarly situated. Let it be observed that this is upon the ground that private property cannot be thus appropriated. Missouri Pacific Railway v. Nebraska, 164 U. S. 403, 17 Sup. Ct. 130, 41 L. Ed. 489. And a railroad company may designate as its loading place for live stock the stock yards of a private corporation, and may refuse to deliver or receive live stock to or from other stock yards, whether they be public or private. Central Stock Yards v. Louisville, etc., Ry. Co., 192 U. S. 568, 24 Sup. Ct. 339, 48 L. Ed. 565. And so may the company route cars as it may seem to its best advantage when to be carried beyond its own lines, a through rate of tariff being agreed upon. Southern Pacific v. Interstate Com. Com., 200 U. S. 536, 26 Sup. Ct. 330, 50 L. Ed. 585. These latter cases determine the absolute rights of the railroad company in the instances disclosed by the record. They have but little bearing, however, upon the manner of rule the company is entitled to adopt for its convenience and dispatch in the furtherance and management of its own business with its patrons and those who may require its services.

Now, the precise inquiry here is whether, as between the petitioner

holding wheat in these warehouses for shipment and the warehouse-men as shippers of their own grain from the same warehouses under the unusual condition of a car shortage, there exists any substantial difference in condition or circumstance, the service required or de-manded being the same, which will warrant the railroad company in furnishing the cars to the latter upon their order, and not to the former unless the order therefor is made through the latter also, and whether, considering the duty of the railroad company and its right of regulat-ing and conducting its business in its own way, subject to the require-ments of the public service, it can require of the petitioner by rule that it make its request for cars through the warehousemen as a con-dition to the company furnishing the same. The contention of the rail-road company seems to be that, as these warehouses are owned in pri-vate capacity, were constructed and now remain upon the company's right of way by its consent and sufferance, and are not recognized by it as public depots for the receipt and shipment of freight general-ly, it is rightfully entitled to adopt and insist upon an observance of the rule inveighed against by the relator. At the same time the com-pany insists that its arrangements with the warehousemen for setting out cars for their use in the shipment of grain are of purely private concern between the company and the warehousemen, and that de-positors other than the warehousemen are without right to insist upon a like service to that extended to the warehousemen. The warehouses in question, though owned and conducted in private capacity, are yet, as has been previously stated, in the larger sense public depositories for the storage of grain. They are open for the use of all who desire the service, and all, it might be said, are accorded the privilege offered without discrimination. The railroad company, of course, was per-fectly cognizant of the nature of the business to be conducted by the warehousemen when it entered into arrangement with them for main-taining the warehouses upon its right of way; and the principal pur-pose to be subserved was to afford the company added facilities for shipping the particular kind of produce to be received therein on storage.

As shown by the petition herein, the traffic in grain from the par-ticular stations and sidings enumerated is very large, and hence it is a thing of great importance to the company that it secure these add-ed facilities from which to make shipments. The ordinary station houses or freight depots are not of sufficient capacity, nor do they afford the requisite means for shipping the great quantities of grain offered for transportation. So, therefore, to meet the situation, and knowing that warehouses are necessary for the storage of grain, as well as affording facilities for its shipment, the company has con-sented with the warehousemen that they may maintain the warehouses on its right of way. There is complete harmony of purpose between the warehousemen and the carrier as it pertains to the maintenance of these depositories, it being, first, to afford a depository for the pro-ducer for storing his grain, and, second, to afford to the railroad company an added facility for handling the same, that it may be read-ily transported elsewhere. Here, then, are two public, or rather,

quasi public agencies operating together. Both are performing a public service—one the storer, and the other the carrier, of a staple commodity of large volume, taking its course in the channels of commerce. The storer has a specific duty to perform, namely, to receive and receipt for, and to load aboard cars when furnished; and the carrier, to furnish the cars and transport the commodity when required so to do. While it might be, in strict legal right, that the former could refuse service to whomsoever it would, yet offer it to all, the railroad company cannot refuse its service to any requiring it, under like or similar circumstances and conditions.

Now, as a means of regulation pertaining to its business of furnishing cars to shippers, the railroad company has required by rule that all orders for cars to be used in the shipment of grain from these warehouses shall come through the warehousemen engaged in the operation of such houses. In what capacity does this place the warehousemen? Do they become the agents for the shipper or for the carrier? The primary duty of the warehousemen, as has been observed, is to place the grain on board the cars when furnished. When they have done this, then their services as bailees are at an end. It is not their undertaking to provide cars, or to ship the grain away. They could be required to load the grain on wagons or other vehicles of conveyance as well as upon the cars, providing they were conveniently placed for the receipt of the grain from the warehouses. There is no other obligation or duty under the conditions of storage, which requires of the warehousemen anything beyond loading the grain out of the warehouses. Thus far, therefore, the storer, who becomes also the shipper, whether the title to the grain has shifted by sale and purchase or not, has not made the warehousemen his agents to furnish cars for the shipment of his grain there on storage. The warehousemen are only, so far as he has any contractual relations with them, to load the grain aboard cars when furnished. Can the carrier, by rule, make of the warehousemen agents for the storer and shipper without his consent? It would seem not. Ordinarily, and it is a rule of the railroad company, I presume, that where freight is offered for shipment at the regular freight depots, it is made the duty of the station agents to make requisition for cars necessary for the shipments, and such is made the regular channel through which cars are supplied. In that case no doubt can be entertained as to whose agent the station agent is. He is the agent of the carrier, and not of the shipper. When the shipper has offered his freight at such depot, it is the duty of the carrier to furnish the shipping facilities, and hence it requires of the station agent that he make the proper requisition for the necessary cars, and the station agent is made the railroad's agent for that purpose, and that it may perform its duty to the shipper. Now, are the conditions greatly different when the shipments are being made from warehouses maintained, as these in question are maintained, as facilities to enable the railroad company to ship the freight offered through them for transportation? The company must have means of communication with the shipper with reference to the freight offered, so that it may be enabled to perform its duty to the public. And to meet this condi-

tion it says, "We will take orders for cars through the warehouse-men. Place your orders with them." Now, who is responsible for any dereliction in duty on the part of the warehousemen when orders are thus placed? Suppose the warehousemen arbitrarily say, "We will not transmit your orders to the company," who is responsible for such an act of the warehousemen? And suppose the shipper is greatly damaged by reason of the warehousemen's refusal to transmit the order, would not the company be liable for a failure to provide the appropriate transportation for shipment? It can scarcely be con-troverted that the railroad company would be held liable. If so, then the warehousemen are the agents of the carrier; and I think this to be the true relation. The railroad company, having a public duty to perform, could not reasonably say to the persons to whom it owes the duty that it will perform it, providing a request therefor is made through certain designated personages, and then shift responsibility because those personages refused to act, or were negligent or un-faithful to their duty. The railroad company cannot shift duty and re-sponsibility in that way. So it must be that the warehousemen become the agents of the railroad company under the rule. The rule, it must be assumed, was conceived in good faith, and under ordinary conditions is well calculated to subserve the business demands of the company and the public in moving the freight from these warehouses; but when the unusual condition of the shortage of cars arose, so that all freight could not be moved in the ordinary course, the warehouse-men having grain of their own to ship succeeded in obtaining a vastly better car service in proportion to the volume of shipment than other purchasers and holders of grain in the same warehouses. The rule while designed to subserve the exigencies fairly, has be-come an instrumentality in the hands of the warehousemen where-by they are obtaining an advantage in the shipment of grain over other storers and shippers.

It is stated in the argument that it often happens that, when the storers have succeeded in having cars set out for their use, such cars are loaded with the grain of persons other than those who have procured them, and that the latter are thus deprived of the service— a sort of theft of the use of cars; and the practice is said to have ob-tained quite generally. The result is that the warehousemen, the agents of the railroad company, are being benefited by reason of the rule complained of, to the detriment of other storers and shippers from the same warehouses, their competitors as dealers in the pur-chase and exportation of such grain. In substantiation of the prac-tice, I need only to quote from two letters, one written March 5, 1907, to J. F. Meyer, car service agent of the defendant company, and the other March 11, 1907, to J. P. O'Brien, the general manager of such company, by Charles E. Curry. By the first he writes:

"If we were accorded the same rights as other shippers and which we contend we are entitled to, we could handle our business as it should be, but your forcing us to look to the warehouse systems for a share of the cars placed for them results in their loading all or practically all the cars so placed for their own account."

And by the second:

"We are compelled to call your attention to the manner in which your company is discriminating against us in the way of supplying cars for wheat loading, at the present time, on the Washington Division. Within the last ten days, Balfour, Guthrie & Co., Kerr, Gifford & Co. and Pacific Coast Elevator Co. each have received in Albina upwards of 100 cars, while during the same period we have received less than ten, and out of this number but three have been loaded out of the warehouses operated by the above-named firms, with whom we have stored at the present time upwards of 15,000 tons of wheat. * * * As it is to-day, a person or corporation not operating a line of houses on your line is practically shut out from doing a wheat business at Portland, due entirely, we think, to the co-operation of the railroad company with the warehouse systems."

Nor are the relative circumstances and conditions of the warehousemen as purchasers and exporters materially dissimilar to those of the storer, purchaser, and exporter. The warehousemen, it is true, are the proprietors or managers of the warehouses; but these, in so far as it concerns the railroad, merely furnish it with the facilities for shipping—filling the place and purpose, as respects the commodity handled, of the public freight houses at the stations. So that these conditions furnish no grounds for a reasonable distinction as to the relative shippers offering freight to be carried from these warehouses. It is plain that the carrier cannot claim that it is serving the warehousemen in a private capacity, because many others are induced to store with the warehousemen, who expect and are entitled to a like service on the part of the railroad company as the warehousemen. Indeed, the entire service, the storage and the carriage, is of quasi public character, and the railroad company can make no discrimination unless there exist other conditions of a dissimilar nature; and this cannot be maintained. The statute imposes upon the railroad company a duty, not only that it shall not make or give any undue or unreasonable preference or advantage, but also that it shall not subject any one to any prejudice or disadvantage. The rule inveighed against, while primarily and ordinarily not unreasonable, does not meet the exigencies of the present situation. The duty of the railroad company is to see that no one is discriminated against. It is clear that, under the present operation of the rule, the warehousemen are obtaining preferences and advantages, while the other storers and shippers are being subjected to prejudice and disadvantage. The railroad company should remedy this inequality, for it is altogether unjust and unreasonable. It should, therefore, see that the warehousemen—its agents—deal fairly with all shippers, themselves included with the number, in ordering and distributing cars according to the respective shippers' proportionate share, and that the parties for whom they are assigned have the privilege of their use. Or it should see to it directly, without the interposition of such agencies, that justice be done to all shippers according as its duty requires it to do. The railroad company should either require absolutely fair treatment at the hands of the warehousemen, or it should abrogate the rule, and formulate one to meet the exigencies of the situation. This duty the company cannot evade under

the guise of a business regulation. It is a positive duty, and must be observed.

As it relates to the sufficiency of the petition and affidavits, there is ample set forth therein to show, prima facie, that the railroad company has been guilty of an evasion of its duty, imposed upon it by law: that it is, by the manner adopted of distributing its cars for the service, subjecting the storers and exporters to an undue and unreasonable prejudice and disadvantage, and thereby discriminating against them and in favor of the warehousemen engaged also in the business of buying and exporting.

The motion to quash should therefore be denied, and the defendant will be granted leave to make such answer as may seem proper.