**MICHIGAN CONSOL. GAS CO. v. FED-
ERAL POWER COMMISSION**
(two cases).

**Nos. 10589, 10783.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 6, 1953.

Decided April 30, 1953.

Charles V. Shannon, Washington, D. C. (Donald R. Richberg, Stanley M. Morley and Wheat, May & Shannon, Washington, D. C., on the brief), for Michigan Consol. Gas Co.

Robert L. Russell, Washington, D. C. (Bradford Ross, Gen. Counsel, Bernard A. Foster, Jr., Asst. Gen. Counsel, Washington, D. C., Louis Flax, Atty., Federal Power Commission, Washington, D. C., on the brief), for Federal Power Commission.

Harry S. Littman, Washington, D. C. (John S. L. Yost, New York City, Scott & Littman, Washington, D. C., Baker & Daniels, Indianapolis, Ind., Steptoe & Johnson, Washington, D. C., on the brief), for Panhandle Eastern Pipe Line.

Arthur E. Palmer, Jr., New York City (Winthrop, Stimson, Putnam & Roberts, New York City, Donald P. Richter, New York City, of counsel, A. H. Aymond, Jackson, Mich., on the brief), for Michigan Gas Storage Co., intervenor.

Before MARIS, McLAUGHLIN and KALODNER, Circuit Judges.

MARIS, Circuit Judge.

Michigan Consolidated Gas Company in these consolidated petitions for review asks this court to set aside two orders issued by the Federal Power Commission in consolidated proceedings involving Panhandle Eastern Pipe Line Company in which proceedings Michigan Consolidated was permitted by the Commission to intervene. The orders under attack prescribed Panhandle's obligation to deliver natural gas to Michigan Consolidated at Detroit and limited its obligation to 125,000 Mcf per day, the amount then currently being delivered, although Michigan Consolidated had claimed the right to receive an additional 75,000 Mcf per day of natural gas from the additional capacity which Panhandle had acquired with the approval of the Commission.

Panhandle Eastern Pipe Line Company produces and purchases natural gas in the Panhandle and Hugoton fields of Texas, Oklahoma and Kansas. It also owns and operates a pipeline system extending through Oklahoma, Kansas, Missouri, Illinois, Indiana and Ohio to northern termini in Michigan and is engaged in the transportation and sale of natural gas in interstate commerce to distributing utilities located along its pipeline system and directly to industries and others for their own use. Panhandle is a natural gas company within the meaning of the Natural Gas Act, 15 U.S. C.A. § 717 et seq.

In January, 1950, Panhandle filed an application with the Commission for a certificate of public convenience and necessity under Section 7(c) of the Act authorizing the construction and operation of additional pipeline and compressor facilities whereby it could receive, transport and deliver 250,000 Mcf per day of additional natural gas to be obtained from Trunkline Gas Supply Company upon completion of the pipeline of the latter extending from the gulf coast of Texas to a point of connection with the Panhandle system near Tuscola, Illinois. The application also requested authority for Panhandle to construct and operate certain appurtenant facilities to permit Panhandle as a part of its expansion program to deliver and sell an additional 50,000 Mcf per day of gas from its own supplies.

Following hearings the Commission on May 4, 1950, issued a certificate of public convenience and necessity to Panhandle for the principal pipeline facilities requested. Further hearings were scheduled with respect to other issues involved in the proceedings, including the proper form of tariff, the rate level to be applicable to Panhandle after the introduction of Trunkline gas, and the question of a fair, reasonable and equitable distribution among present and prospective customers of the volume of natural gas which would be available upon completion of the authorized Trunkline and Panhandle facilities.

The Commission, following further hearings, issued its Opinion No. 214 on June 13, 1951 finding that the rate schedules contained in Panhandle's then existing contracts with its utility customers were not uniform with respect to service and volumetric obligations, and prescribing a tariff containing new rate schedules and related forms of service agreements to become applicable to the operations of Panhandle after the introduction of the Trunkline gas into its system. The rates thus prescribed were "rates which are sometimes referred to as 'rolled-in', whereby the cost of Trunkline gas is included along with Panhandle's other costs; in other words, for all customers these rates should be based upon the total cost of Panhandle for rendering natural gas service." On August 17, 1951 Panhandle filed with the Commission a tariff in the form prescribed by Opinion No. 214 and the accompanying order. Upon applications for rehearing the Commission after further hearings issued its Opinion No. 214–A and accompanying order on August 23, 1951, directing that certain minor modifications and revisions be made in the form of the tariff. Thereafter Panhandle amended its proposed tariff to comply with Opinion No. 214–A, except as to one matter not presently pertinent.

The Commission's Opinion No. 214 provided that during the following period of thirty days Panhandle and its customers would be given the opportunity to negotiate contracts under the new form of tariff and to file them as exhibits with the Commission; that customers who did not negotiate such contracts were to file as exhibits with the Commission within ten days thereafter sworn statements of the amounts of natural gas which they would be willing to purchase from Panhandle under the form of service agreement contained in the tariff, and that thereafter the Commission would consider and determine the remaining issues in the proceedings including the issue of the equitable distribution of gas among Panhandle's customers. Accordingly during the course of the hearings which were resumed July 23, 1951 Panhandle filed as exhibits newly executed service agreements which it had entered into with all but eight of the resale interstate customers which it served. The latter customers filed as exhibits sworn statements specifying the volumes of gas desired which statements were modified and supplemented at the hearing by testimony and statements of counsel. Among the latter customers was Michigan Consolidated, which filed a statement specifying 200,000 Mcf per day at Detroit and 2,000 Mcf per day at Ann Arbor as its desired volume.

On August 31, 1951 the Commission issued its Opinion No. 218, later modified by Opinion No. 218–A issued October 15, 1951, in which the Commission determined Panhandle's designed capacity to be 850,000 Mcf [1] per day and found that such capacity would be insufficient to meet the firm requirements of Panhandle's customers during the winter of 1951–1952. It, therefore, allocated the capacity of Panhandle's system among its customers, prescribing the minimum daily volumes which Panhandle would be required to deliver to each customer on days when the total requirements of all customers exceeded 850,000 Mcf. The orders accompanying these opinions directed Panhandle to operate its pipeline system and to make deliveries of gas to its customers in accordance with the terms of the opinions during the period in question pending the effectiveness of a new tariff and service agreements executed thereunder.

[1]. Between May 4, 1950 and August 31, 1951 Panhandle had received temporary authorization from the Commission to increase further its daily delivery capacity by an additional 50,000 Mcf.

In Opinion No. 218 the Commission stated:

"Michigan Consolidated Gas Company has shown a willingness to contract for 202,000 Mcf, or 75,000 Mcf more than its existing contract volume heretofore approved by the Commission. Panhandle has applied for permission to abandon some 37,500 Mcf of this service at the end of 1951. Subject to further order when the abandonment proceeding, after being heard, is before the Commission, it is determined that the 1951–1952 peak delivery allowable is 127,000 Mcf."

Thus by Opinion No. 218 and its accompanying order the Commission denied Michigan Consolidated's request for 75,000 Mcf of Panhandle's additional capacity and limited it for the winter of 1951–1952 to its existing contract volume. It is this order which Michigan Consolidated seeks to have set aside as to it by its petition for review filed to No. 10,589.

Panhandle's proposed tariff was not made effective by the Commission upon the introduction of Trunkline gas into the Panhandle system as requested by Panhandle. Instead the tariff was suspended by order issued September 5, 1951 until February 20, 1952, pending hearing as to the lawfulness of the proposed increased rates and other matters contained therein. On March 5, 1952, the proceeding not having been concluded and an order made, the Commission upon motion of Panhandle filed pursuant to the mandatory provisions of Section 4(e) of the Act, issued an order directing the tariff and service agreements executed thereunder to become effective as of February 20, 1952 upon the execution by Panhandle and approval by the Commission of a surety bond in the sum of $2,000,000 conditioned upon the repayment by Panhandle to those entitled thereto of any portion of the increased rates and charges which might ultimately be found unjustified, together with interest. Such a bond was filed by Panhandle. Accordingly the new tariff and the service agreements which had then been executed thereunder with 45 of Panhandle's 49 resale interstate customers [2] went into effect as of February 20, 1952.

The Commission further found in its order issued March 5, 1952 that it was necessary and desirable in the public interest to continue in effect "as executed service agreements" the "present contracts on file with the Commission" between Panhandle and the four customers which had not executed service agreements under the new tariff, namely, Michigan Consolidated Gas Company, Gas Service Company, Texas Gas Transmission Corporation and Central West Utility Company, as modified by the appendices of the order; that such contracts, as thus modified, constituted "just and reasonable executed service agreements for the period they may be effective"; and that the volumes prescribed in the appendices of the order should constitute firm volumetric obligations of Panhandle for said companies during the months April through October, 1952 and for subsequent years until superseded by new service agreements or otherwise changed by the Commission. Accordingly the Commission ordered that such "present contracts" as modified by the appendices of the order should "continue in effect as executed service agreements between the parties". Appendix A of the order continued the maximum daily delivery obligation of Panhandle to Michigan Consolidated at 125,000 Mcf at Detroit and 2,000 Mcf at Ann Arbor.

The order issued March 5, 1952 contained the following statement:

"While it is true that Panhandle's contract with Michigan Consolidated with respect to service in the Detroit area of Michigan provides for expiration on December 31, 1951, its application for partial abandonment of service to Michigan Consolidated, Docket No. G–1725, is still pending before the Commission. By Opinion No. 218 the Commission determined that Panhandle should continue to deliver on a firm basis to Michigan Consolidated 127,000 Mcf per day (125,000 Mcf per day at Detroit and 2,000 Mcf per day at Ann

2. Four of these agreements were executed and filed as exhibits after the issuance, on August 31, 1951, of Opinion No. 218.

Arbor), and to Texas Gas 18,000 Mcf per day."

It is this order retaining Michigan Consolidated's maximum daily volume from Panhandle at 127,000 Mcf per day for the future, and thus in effect disallowing its request for 75,000 Mcf additional, which is the subject of the petition for review filed to No. 10,783.

The Commission in its Opinion No. 218 indicated that the application of Michigan Consolidated for additional natural gas from the Panhandle system involved a special situation resulting from Panhandle's pending application for permission to abandon 37,500 Mcf per day of its existing service at Detroit. It, therefore, stated in Opinion No. 218 that its determination that Michigan Consolidated should be limited to its existing contract demand was "Subject to further order when the abandonment proceeding, after being heard, is before the Commission".

■ Having thus reviewed the background facts we turn to the questions raised by Michigan Consolidated's petitions for review. So far as concerns the first of the two consolidated petitions now before us, the petition directed to the Commission's Opinion No. 218 and accompanying order and filed at No. 10,589, but little need be said. The petitioner objects to the allocation of natural gas made to it by that opinion and order. The allocation made by that opinion and order was, however, merely for the winter of 1951-1952. It did not prescribe or purport to prescribe the allocation of gas for any later period. The winter of 1951-1952 has passed. The natural gas to be distributed by Panhandle pursuant to Opinion No. 218 and its accompanying order has all, therefore, long since been distributed. Nothing which the Commission or this court might now do could reverse that distribution. No question of rates or charges is involved. Accordingly the controversy raised by the first petition for review is moot and the petition must be dismissed.

The second petition, however, is addressed to the Commission's later order issued March 5, 1952 which fixed the maximum delivery obligation of Panhandle to

Michigan Consolidated from and after February 20, 1952 and until further order of the Commission at 127,000 Mcf per day. That maximum obligation is presently in effect by virtue of this order. The questions raised by this petition for review, therefore, involve present and future rights of Michigan Consolidated to receive natural gas from the Panhandle system. In support of its petition for review of this order Michigan Consolidated contends that the Commission acted arbitrarily and illegally in refusing to allocate to it any portion of Panhandle's increased capacity; that the Commission ignored its proposed findings of fact and failed to make adequate findings to support its order and that the Commission erroneously assumed that the prohibition of Section 4(b) of the Act against unreasonable differences in services and rates did not apply to it. We have carefully considered all these contentions and find them to be wholly without merit.

The basic defect which underlies all of Michigan Consolidated's contentions is that they fail to recognize what clearly appears from the record, namely, that Michigan Consolidated's case presented to the Commission a special situation not existing in the case of Panhandle's other customers, and that the Commission's action with respect to Michigan Consolidated was based upon and justified by the special situation in which it found itself.

Panhandle's deliveries to Michigan Consolidated at Detroit had been made under a contract which provided that Panhandle would supply to Michigan Consolidated its requirements of natural gas at Detroit up to a maximum volume of 125,000 Mcf per day, subject to certain limitations not presently pertinent. This contract, as amended, expired on December 31, 1951 by virtue of its own terms and pursuant to a notice which had been given to Michigan Consolidated by Panhandle. On June 21, 1951 Panhandle filed with the Commission an application for permission to reduce deliveries of natural gas to Michigan Consolidated at Detroit from 125,000 Mcf to 87,500 Mcf per day after December 31, 1951. This application had been made the subject of a separate proceeding before the

Commission and it was the pending abandonment proceeding to which the Commission referred in Opinion No. 218. This application by Panhandle for abandonment of part of its daily deliveries to Michigan Consolidated was based upon prior decisions of the Commission in a proceeding involving the issuance of a certificate of convenience and necessity to Michigan-Wisconsin Pipe Line Company, an affiliate of Michigan Consolidated, which proposed to supply natural gas to Michigan Consolidated in competition with Panhandle.

Panhandle alleged that in the proceeding just referred to the Commission decided that effective December 31, 1951 upon the expiration of the Detroit contract Panhandle would be under no obligation to deliver more than 87,500 Mcf of gas per day to Michigan Consolidated at Detroit and that after that date the obligation to supply the remaining requirements of Michigan Consolidated should rest upon Michigan-Wisconsin. It pointed to the fact that Michigan Consolidated and Michigan-Wisconsin had executed and filed with the Commission a service agreement obligating Michigan-Wisconsin to supply the entire natural gas requirements of Michigan Consolidated at Detroit over and above 87,500 Mcf per day after December 31, 1951. It was on the basis that Michigan Consolidated's right to Panhandle's gas was fixed by the decision in the Michigan-Wisconsin case that Panhandle objected to Michigan Consolidated's intervention in the proceedings now under review. This is the special situation which the Commission contends justified it in holding Michigan Consolidated's allocation of gas from the Panhandle system at its current amount pending Commission action in the abandonment proceeding and to this extent treating Michigan Consolidated differently from Panhandle's other customers.

 In reviewing this case under Section 19(b) of the Act, we must bear in mind that the findings of the Commission, as to the facts, if supported by substantial evidence as they are here, are conclusive. The problem of the allocation of service to various customers is one which calls for judgment within the Commission's peculiar and expert competence. Judicial review of the Commission's orders with respect to this question is, we think, limited by the rule as to the review of rate orders laid down by the Supreme Court in Federal Power Comm. v. Natural Gas Pipeline Co., 1942, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037, as follows:

"Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

 In view of the fact that Panhandle's application for abandonment of deliveries to Michigan Consolidated in excess of 87,500 Mcf per day was pending before the Commission and undetermined and in the light of the other facts to which we have referred it was quite obviously not arbitrary for the Commission in the proceeding now under review to decline to order any change, either up or down, in Panhandle's maximum delivery obligations to Michigan Consolidated pending the conclusion of the abandonment proceeding. This, as we have seen, is the position the Commission took in Opinion No. 218 and reiterated in the order issued March 5, 1952. Moreover in Opinion No. 218 it made the continuance of 127,000 Mcf per day as the maximum delivery requirement expressly subject to the further order of the Commission "when the abandonment proceeding, after being heard, is before the Commission."

Michigan Consolidated urges that the Commission's findings are not sufficient to disclose the basis for its action. We do not agree. On the contrary we think it is perfectly clear from the record that the

Commission's action was, as we have stated, taken in order to preserve the status quo without prejudice to the contentions of either party in the pending abandonment proceeding and with the express reservation of jurisdiction by the Commission to revise its allocation of natural gas from the Panhandle system if upon the determination of the abandonment proceeding it should appear to the Commission that Michigan Consolidated is entitled to the delivery of either more or less than 127,000 Mcf per day. It follows that while the order under attack undoubtedly treated Michigan Consolidated differently from other customers of the Panhandle system, the difference was not unreasonable and the discrimination not undue. The order accordingly did not violate the Act.

■ We see no merit in Michigan Consolidated's contention that the Commission acted arbitrarily in refusing to allot it any portion of Panhandle's increased capacity while at the same time imposing upon it, by approving Panhandle's new "rolled-in" rate, a large portion of the increased cost of that additional capacity. For this increase is implicit in the basic idea of the "rolled-in" rate and it applies equally to all customers of Panhandle regardless of how much or how little gas they are allotted or of the source from which it comes. This contention is in reality an attempt by Michigan Consolidated to attack indirectly and collaterally the Commission's Opinion No. 214 and accompanying order which approved the "rolled-in" rate. But that opinion and order have long since become final and not subject to review.

■■ Finally, we cannot accede to the contention of Michigan Consolidated that the Commission violated Section 4(b) of the Act in permitting Panhandle to discriminate between general service buyers, which derive their entire supply of natural gas from the Panhandle system, on the one hand, and limited service buyers, which do not wholly depend on the Panhandle system but have other available sources of supply as well, on the other hand. Michigan Consolidated is in the latter class. In the regulation by the Commission of the business of transporting and selling natural gas in interstate and foreign commerce it is quite possible that, in the public interest, different standards must be applied for the treatment of different classes of customers. It is only when a preference or advantage accorded to one customer over another is undue or a difference in service as between them is unreasonable that Section 4(b) of the Act comes into play.[3] "And the courts have always recognized that Congress intended to commit to the Commission the determination, by application of an informed judgment to existing facts, of the existence of forbidden preferences, advantages and discrimination."[4] There is clearly a difference in the situation of those customers which are wholly dependent on Panhandle for their natural gas and those which have another source of supply as well. To distinguish in treatment between the two classes cannot of itself alone result in an undue preference or advantage or in an unreasonable difference in service.

The petition in No. 10,589 will be dismissed. The order issued March 5, 1952 which is the subject of the petition in No. 10,783, will be affirmed insofar as it relates to the petitioner.

3. Interstate Commerce Comm. v. Baltimore & O. Railroad Co., 1892, 145 U.S. 263, 276, 12 S.Ct. 844, 36 L.Ed. 699; Swayne & Hoyt, Ltd. v. U. S., 1937, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659; United States ex rel. Northwestern Warehouse Co. v. Oregon R. & Navigation Co., C.C.D.Or.1908, 159 F. 975, 978.

4. Justice Black in United States v. Chicago Heights Trucking Co., 1940, 310 U. S. 344, 352–353, 60 S.Ct. 931, 936, 84 L.Ed. 1243.